FILED - GR
January 17, 2008 1:25 PM
RONALD C. WESTON, SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:____mla____/_____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURIE MARCUS,

    Plaintiff,

-vs-

SPECTRUM HEALTH HOSPITALS
d/b/a SPECTRUM HEALTH –
DOWNTOWN CAMPUS,

    Defendant.

Case No.: **1:08-cv-59**

Honorable **Janet T. Neff
U.S. District Judge**

_____/

**MILLER COHEN, P.L.C.**
Robert D. Fetter (P68816)
600 West Lafayette Blvd.
Detroit, Michigan 48226
(313) 964-4454

And

**Timothy A. Greimel (P61743)**
32 Roanoke Lane
Rochester Hills, Michigan 48309
(248) 425-7525

Attorneys for Plaintiff
_____/

## COMPLAINT

For her Complaint, Plaintiff Laurie Marcus ("Ms. Marcus"), by and through her attorneys Robert D. Fetter of Miller Cohen, P.L.C. and Timothy A. Greimel, states:

### JURISDICTION AND VENUE

1.    At least one of Ms. Marcus' claims arises under the Constitution, laws, or treatises of the United States.

2.    In accordance with 28 U.S.C. § 1331, this Court has original subject

matter jurisdiction over Ms. Marcus' claims arising under the Constitution, laws, or treatises of the United States.

3. Ms. Marcus' claims arising under state law form part of the same case or controversy as her claims arising under the Constitution, laws, or treatises of the United States.

4. In accordance with 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Ms. Marcus' claims arising under state law.

5. The defendant resides in the judicial district of this Court.

6. In accordance with 28 U.S.C. § 1391(b)(1), this Court is the appropriate venue for this action.

## COMMON ALLEGATIONS

7. Defendant Spectrum Health Hospitals d/b/a Spectrum Health–Downtown Campus ("Spectrum") operates a number of hospitals and other health care facilities throughout western Michigan.

8. In December 1998, Ms. Marcus began employment with Spectrum as a part-time Phlebotomist/Lab Service Representative at Spectrum's Butterworth Campus.

9. In May 2004, Ms. Marcus accepted a full-time position with Spectrum's outreach department at Spectrum's Kent Community Campus.

10. When Ms. Marcus, accepted the full-time position at the Kent Community Campus, it was made clear to her that the new position was a lateral move and that her only additional responsibilities, beyond her existing job responsibility of drawing blood, would be specimen ordering and insurance registration.

11. Shortly after Ms. Marcus began working in her new full-time position at the

Kent Community Campus, she was informed that she would occasionally be expected to help students at Walker Medical Instructional Services ("Walker Medical") with their phlebotomy externship by assisting each student with 25 blood draws.

12. Once Ms. Marcus began assisting the Walker Medical students, she realized that there were 150 to 200 more monthly blood draws than there had been historically and that substantially more responsibility was being expected of her than her job description entailed.

13. In November 2004, Ms. Marcus learned that certified nursing assistants employed by Spectrum Health–Kent Community Campus who trained students were being paid $1.00 more per hour than she was.

14. Ms. Marcus approached her supervisor, Lois Vandyke ("Ms. Vandyke") about this pay disparity.

15. Ms. Vandyke told Ms. Marcus she would look into the matter, but she never got back to Ms. Marcus with an answer.

16. In December 2004 or January 2005, Ms. Vandyke approached Ms. Marcus with the idea of creating a new educator and coordinator position for her based on the additional responsibilities that she had already assumed.

17. The proposed position would elevate Ms. Marcus pay grade from level 9 to level 12, resulting in a wage increase of $4 to $5 per hour.

18. At approximately the same time, Ms. Marcus was asked to assist with phlebotomy classes and ultimately was put in charge of all phlebotomy classes for current employees and of all policy and procedure orientations for new, incoming staff.

19. Ms. Marcus assumed these substantial responsibilities in addition to her

existing duties of ordering all laboratory supplies, stocking all of the units, updating face sheets and insurance details, drawing blood from patients, entering charges for insurance, training Walker Medical students, and periodically assisting Grand Valley State University nursing students with blood draws..

20. Moreover, the number of Walker Medical students whom Ms. Marcus was responsible for training doubled around this time.

21. Ms. Marcus met separately with both Ms. Vandyke and Ineke Gallup, the Staff Development Director of Spectrum Health-Kent Community Campus, in order to list in detail all of her extra responsibilities for them.

22. In response to Ms. Marcus` raising of these concerns, she was informed that the new educator and coordinator position would be created for her, although it would take a little time to process the paperwork and obtain formal approval from the involved departments.

23. During the following six months, Ms. Marcus periodically asked Ms. Vandyke when the new position would be created.

24. Ms. Vandyke always assured Ms. Marcus that the new position would be created and the associated pay increase would occur, but that the process of obtaining formal authorization took time.

25. During the summer of 2005, Ms. Marcus and Ms. Vandyke met in order to go over Ms. Vandyke`s annual review.

26. By August 2005, the promised new position had still not materialized, but Ms. Vandyke continued to promise Ms. Marcus that it would be created for her.

27. When Ms. Marcus asked Ms. Gallup about the position, Ms. Gallup told

4

Ms. Marcus that she was still waiting for Ms. Vandyke to take the next step. This naturally concerned Ms. Marcus, and she called Ms. Vandyke by telephone. Ms. Vandyke said that it was she who was waiting on Ms. Gallup.

28. Then, after looking back at some old e-mails, Ms. Vandyke told Ms. Marcus that it was she after all, and not Ms. Gallup, who had "dropped the ball" and neglected to take the necessary next steps in order to establish the new position.

29. Ms. Vandyke then began crying and assured Ms. Marcus that she would once again initiate the process to create the new position..

30. At approximately the same time, Ms. Marcus developed a stress-related medical illness and took a six week leave from work under the Family Medical Leave Act ("FMLA").

31. On October 3, 2005, Ms. Marcus' FMLA leave ended, and she took a one week, unpaid vacation. On October 12, 2005, Ms. Marcus returned to work.

32. Upon returning to work, Ms. Marcus was informed that her job responsibilities relating to the ordering and registering of specimens were being permanently taken away from her.

33. Ms. Marcus also learned that a rumor had circulated while she was on FMLA leave that her work hours would soon be cut to only four per day. Ms. Marcus asked Ms. Vandyke about the rumor, and Ms. Vandyke assured Ms. Marcus that such a thing would never happen unless Ms. Marcus wanted it to.

34. Although Ms. Marcus began to doubt that the promised new position would be created, she continued to work diligently on her remaining job responsibilities trying to trust that Spectrum Health would abide by its promises.

35. On November 28 2005, Ms. Marcus noticed that Spectrum Health posted a job opening for an "Outreach Customer Service Coordinator." When she read the job description for the "Outreach Customer Service Coordinator" position, Ms. Marcus realized that its job duties were extremely similar to those that she had been performing for the past 18 months.

36. Although she was deeply troubled by this discovery, Ms. Marcus continued to trust her employer's promises and to believe that Ms. Vandyke was processing her promotion. As a result, Ms. Marcus did not apply for the position of "Outreach Customer Service Coordinator."

37. Also on November 28, 2005, Ms. Marcus was instructed to begin recording her work activity in a log.

38. In January 2006, Ms. Marcus learned that her hours at Spectrum Health-Kent Community Campus would be reduced because she did not have enough work to keep her busy there for a full eight-hour shift. At that time, Ms. Marcus was told that she would work at other facilities on an as-needed basis to make up the lost hours at Spectrum Health-Kent Community Campus.

39. As part of these rotational assignments, Ms. Marcus was assigned to assume the former duties of the newly hired Outreach Customer Service Coordinator.

40. At approximately the same time, Amy Lodenstein, the Director of Nursing at Spectrum Health-Kent Community Campus, told Ms. Marcus that there was no need to promote Ms. Marcus to the position she had been promised because Ms. Lodenstein did not see a need for the position and there were no funds available for it.

41. In March 2006, Ms. Marcus informed Spectrum Health that she could no

longer help train the Walker Medical students because Spectrum Health had paid educators who should be doing this.

42. Spectrum Health suggested that this would put Walker Medical in a bind and asked Ms. Marcus if she would help with one last group of Walker Medical students as well as some classes at Spectrum Health-Kent Community College.

43. Ms. Marcus reluctantly agreed to do so.

44. Ms. Gallup then told Ms. Marcus that she could work more than her scheduled four hours per day if she were willing to continue to train the students without a higher wage.

45. Ms. Marcus said she would, but she realized that she needed to start looking for another job.

46. In early April 2006, Spectrum Health added insult to injury when Ms. Gallup sent Ms. Marcus an e-mail asking her to meet with the new Outreach Customer Service Coordinator to explain to her how to do her new job.

47. At the same time, rumors began circulating that Spectrum Health was going to terminate Ms. Marcus.

48. Ms. Marcus gave her two weeks notice, and her last day of work was on April 20, 2006.

## PROMISSORY ESTOPPEL

49. Plaintiffs incorporate by reference all preceding paragraphs.

50. Spectrum Health repeatedly promised Ms. Marcus a promotion.

51. Ms. Marcus detrimentally relied on Spectrum Health's promises by continuing to work for Spectrum Health, by not applying for the Outreach Customer

Service Coordinator position, and by not applying for outside employment.

52. As a result of her detrimental reliance, Ms. Marcus has suffered substantial economic damages.

Wherefore, Ms. Marcus requests that this Court award her damages in excess of $1,000,000, exclusive of interest and costs.

## VIOLATION OF FAMILY MEDICAL LEAVE ACT RIGHTS

53. Plaintiffs incorporate by reference all preceding paragraphs.

54. The Federal Family Medical Leave Act ("FMLA") provides an employee with the right to take up to twelve weeks of unpaid leave time when the employee is unable to work due to a serious medical condition and to return to the his/her original job, or an equivalent job, with the same pay, benefits, job duties, and terms and conditions of employment.

55. In accordance with the FMLA, Ms. Marcus took six weeks of unpaid leave time when she was unable to work due to a serious medical condition.

56. In violation of the FMLA, Spectrum Health eliminated some of Ms. Marcus' job duties upon her return from FMLA leave.

57. Moreover, Spectrum Health violated FMLA by reducing Ms. Marcus' hours shortly after she returned from FMLA leave, by not promoting her to the promised new position, and by constructively terminating her both by whittling down her hours of work and job duties and by embarrassing and humiliating her in the workplace.

58. Spectrum Health's actions constitute interference with Ms. Marcus' rights under the FMLA. Its actions were also in retaliation for Ms. Marcus exercising her FMLA rights

59. As a result of Spectrum Health's interference with Ms. Marcus' rights and retaliation for exercising her rights under the FMLA, Ms. Marcus has suffered substantial economic and emotional damages.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter an order:

a. Grant her all available damages for lost wages, lost benefits, and other compensation, plus interest thereon at the statutory rate.

b. Additional liquidated damages in the amount of the above-requested award.

c. Grant Plaintiff all necessary injunctive relief, including front pay;

d. Grant Plaintiff's reasonable attorney's fees and costs incurred in this litigation; and

e. Grant all such further relief as shall meet equity and good conscience.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

60. Plaintiffs incorporate by reference all preceding paragraphs.

61. The facts previously set out give rise to a cause of action for intentional infliction of emotional distress because Defendant's conduct was extreme and outrageous as those terms are understood and defined by the laws of the State of Michigan. Defendant's agents' conduct toward Plaintiff was either intentional or reckless. Defendant's conduct in allowing this hostile environment to exist was either intentional or reckless. The Defendant's conduct proximately caused the Plaintiff to suffer severe emotional distress.

**WHEREFORE** Plaintiff requests that this Honorable Court:

a. Grant her all available compensatory damages for economic injury, extreme mental and emotional distress and other damages.

b. Grant all such further relief as shall meet equity and good conscience.

Respectfully submitted,

By: _____
Robert D. Fetter (P68816)
Miller Cohen, P.L.C.
600 West Lafayette Blvd.
Detroit, Michigan 48226
(313) 964-4454

Timothy A. Greimel (P61743)
32 Roanoke Lane
Rochester Hills, Michigan 48309
(248) 425-7525
Attorneys for Plaintiff

Dated: January 16, 2008

10